**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TABITHA LYNN SMITH,**

      **Plaintiff,**

**vs.**                                                                 **CIVIL ACTION NO. 2:19-CV-00747**

**ANDREW SAUL,
COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered October 16, 2019 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 11, 12)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for reversal or remand (ECF No. 11), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 12); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Tabitha Lynn Smith, (hereinafter referred to as "Claimant"), protectively filed her applications for benefits on April 20, 2016 when she was 29 years old, alleging disability since December 11, 2010 because of spinal stenosis, migraines, neck injury, rheumatoid arthritis, herniated discs at L3-5, and lumbar disc disease.[1] (Tr. at 197, 201, 238) Her claims were initially denied on August 16, 2016 (Tr. at 78, 79) and again upon reconsideration on October 28, 2016 (Tr. at 100, 101). Thereafter, Claimant filed a written request for hearing on December 13, 2016. (Tr. at 135-136)

An administrative hearing was held on June 26, 2018 before the Honorable David Read, Administrative Law Judge ("ALJ"). (Tr. at 33-57) On October 5, 2018, the ALJ entered an unfavorable decision. (Tr. at 7-27) On October 11, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 191-193) The ALJ's decision became the final decision of the Commissioner on August 15, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On October 14, 2019, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (ECF No. 11), in response, the Commissioner filed a Brief in Support

---

[1] In her Disability Report – Appeal, submitted on September 26, 2016, Claimant alleged that she asserted that she had been diagnosed with fibromyalgia and that she had pain and numbness in her leg and back for which surgery was recommended and that she had experienced an increase in the frequency of migraines. (Tr. at 260) In a subsequent Disability Report – Appeal, Claimant asserted that she began medication for fibromyalgia and that her neurosurgeon advised that she would be unable to return to her job "due to no lifting, sitting, standing, bending or keeling for long periods of time." (Tr. at 279)

of Defendant's Decision (ECF No. 12). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 31 years old when the ALJ entered the unfavorable decision, thus categorized as a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 20) Claimant has a high school education and some college education. (Tr. at 39, 239) For the past 15 years, Claimant worked providing patient care on the oncology floor at Charleston Area Medical Center, then as a surgical assistant for an oral surgeon, and lastly as a part-time home health aide for several years.[2] (Tr. at 39-42)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

---

[2] The ALJ considered Claimant's work earnings from 2011 through 2015 and determined them to fall below the requisite level of substantial gainful activity levels and noted that although Claimant's earnings in 2016 were above substantial gainful activity level, he determined this work constituted an unsuccessful work attempt because it lasted less than six months as a result of her impairments, specifically, her back surgery. (Tr. at 12-13)

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2021. (Tr. at 12, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of December 11, 2010. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine; lumbar radiculopathy; and obesity. (Tr. at 13, Finding No. 3)

4

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14-15, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work except

> the claimant requires a sit/stand option at one hour intervals; can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl; cannot climb ladders, ropes, or scaffolds; cannot tolerate exposure to unprotected heights; can tolerate occasional vibrations.

(Tr. at 15, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing her past relevant work. (Tr. at 19, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ then determined that there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Tr. at 20, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from December 11, 2010 through the date of the decision. (Tr. at 21, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of her appeal, Claimant asserts that the ALJ disregarded the evidence provided by Claimant's long-time treating physician, Susan Cavender, M.D., plus the ALJ did not evaluate Dr. Cavender's opinion in accordance with the factors espoused by the Regulations. (ECF No. 11 at 10-13) Claimant also argues that the ALJ's RFC finding is not supported by substantial evidence because the treating source opinion evidence was not properly assessed. (Id. at 2) Finally, the ALJ also did not address the uncontested vocational expert's testimony that established Claimant's disability. (Id. at 13)

Claimant requests this Court reverse the decision and direct an award for benefits or remand for correction of these errors. (Id.)

In response, the Commissioner asserts that the ALJ properly evaluated Dr. Cavender's opinions and explained the weight he gave them; additionally, the ALJ discussed the other evidence of record that was inconsistent with Dr. Cavender's opinions. (ECF No. 12 at 12-15) The Commissioner argues that contrary to Claimant's assertions, the ALJ adequately considered the Regulatory factors when assessing Dr. Cavender's opinion and that this Court has recognized that the Regulations does not explicitly require an adjudicator to recount the details of his analysis of medical opinions. (Id. at 15-16) The ALJ gave good reasons for discounting Dr. Cavender's opinions, which is the only mandate under the Regulations. (Id. at 16) In short, Claimant is basically asking this Court to impermissibly re-weigh the evidence and to come to a different conclusion. (Id. at 16-17)

In sum, the Commissioner states that the ALJ's decision finding Claimant was capable of other work and not disabled is supported by substantial evidence and asks this Court to affirm. (Id. at 17)

**The Relevant Evidence of Record**[3]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Treatment for Lumbar Spine:

The record contains minimal treatment for Claimant's back-related issues until September 16, 2011 when she sought treatment for back pain at Charleston Area Medical Center's emergency

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

room. (Tr. at 550) Claimant stated that she had gone to urgent care the previous day, and x-rays revealed no abnormalities. (Id.) She denied any numbness, tingling, or weakness, and stated that the pain radiated into her right lower extremity. (Id.) On a physical examination, Claimant exhibited some pain upon palpation of her right paralumbar musculature, and she was tender with flexion, extension, lateral rotation, and lateral flexion of the spine. (Tr. at 551) However, she was able to move, a straight leg raising test was negative, and there were no other abnormalities. (Id.) She was diagnosed with right-sided sciatica and was discharged to her home with instructions to apply heat and take Motrin and Flexeril, as needed. (Id.)

On October 3, 2011, Claimant underwent an MRI of her lumbar spine, which revealed degenerative changes, superimposed disc protrusions at L3-4 and L4-5, asymmetric to the left, and areas of canal and foraminal stenosis. (Tr. at 350)

On August 21, 2015, Claimant, who was pregnant at the time, sought treatment for complaints of headaches and spinal stenosis from Darshan Dave, M.D., at the Neurology and Headache Clinic. (Tr. at 334) On a physical examination, Claimant's gait, coordination, sensation, and deep tendon reflexes were normal. (Tr. at 335) Dr. Dave opined that Claimant was suffering from chronic tension headaches, which were usually worse during pregnancy. (Id.) He advised her to treat her headaches with Tylenol. (Id.)

On April 19, 2016, Claimant returned to Dr. Dave with complaints of worsening back pain. (Tr. at 339) On a physical examination, her gait, station, strength, and muscle tone were normal, and she had no muscle atrophy. (Tr. at 340) Electromyogram/nerve conduction studies of her bilateral lower extremities were consistent with L5 radiculopathy. (Tr. at 347)

On May 6, 2016, Claimant underwent an MRI of the lumbar spine that showed disc herniations at L3-L4 and L4-L5, which were larger as compared with a prior study on October 3, 2011. (Tr. at 514)

The record indicates that Claimant has been treated by primary care physician Susan Cavender, M.D., since at least June 1992, however, there is no record of her complaining to Dr. Cavender of back pain until May 9, 2016. (Tr. at 516) On that date, Claimant stated that she was working from 6:45 am until 1:30 pm as a home health aide, and she had to drive all day. (Tr. at 462) Claimant stated that her back hurt with sitting and standing, and that it helped to lean her leg over. (Id.)

On May 16, 2016, Claimant returned to Dr. Dave and noted that her pain felt worse with sitting and standing still, but a little better with walking, and bending over relieves the pain. (Tr. at 343) A physical examination revealed that Claimant had a normal gait and station, intact strength, and normal muscle tone. (Tr. at 344)

Claimant completed two sessions of physical therapy in May and July of 2016. (Tr. at 366) She made good progress with regard to range of motion and strength, although her pain continued in her back and lower extremities; it was recommended that she attend additional sessions. (Tr. at 367) Claimant did not return for any additional treatment.

On June 15, 2016, Dr. Cavender noted that Claimant was unable to take any medications because she was breast feeding. (Tr. at 476) Claimant reported that the only thing that helped her pain was being in water. (Id.) She was unable to lift her baby, who weighed 21 pounds. (Id.) Claimant was able to heel walk, but she was not able to toe walk secondary to tibia pain. (Id.)

On June 21, 2016, Claimant was referred by Dr. Cavender for a consultation with Matthew P. Walker, M.D., at Neurological Associates, Inc. (Tr. at 356) Claimant complained to Dr. Walker of severe pain in her lower back that radiated down to her lower extremity. (Id.) On a physical examination, Claimant ambulated with an antalgic gait, but her station was normal. (Tr. at 358) She had pain to palpation over the midline of her lumbar spine, with painful range of motion with flexion and extension. (Id.) Her strength was 5/5 in her upper and lower extremities, except for slightly reduced flexion in her left hip and slightly reduced extension in her left knee. (Id.) Her sensation was intact to light touch in her right leg but altered diffusely in her left leg. (Id.) She had full and painless range of motion in all her joints without instability, atrophy, swelling, or tenderness. (Id.) A straight leg raising test was positive bilaterally. (Id.) Dr. Walker recommended that Claimant be referred to pain management. (Id.) He opined that Claimant did not have any surgically remediable spine pathology. (Id.)

On July 15, 2016, Claimant presented as a new patient at the Cabell Huntington Hospital (CHH) Pain Management Center. (Tr. at 695) On examination, Claimant exhibited pain in her thoracolumbar spine, but she stood and walked unassisted. (Tr. at 698) She had slightly diminished sensation to touch on the left, but 4/5 strength. (Id.) A straight leg raising test was "slightly positive". (Id.) Claimant was given a transforaminal epidural steroid injection. (Tr. at 699)

On July 19, 2016, Claimant sought a second opinion regarding surgical options for her back pain with neurosurgeon, Rida Mazagri, M.D. (Tr. at 430-432) Dr. Mazagri noted Claimant's low back pain radiated down into her left leg and into her foot with numbness and tingling sensations in the left leg down to the ankle as well as weakness in the left leg. (Tr. at 430) Dr. Mazagri thought Claimant's symptoms were most probably related to multilevel degenerative disc

disease of the lumbar spine as well as due to the large disc herniation at left L4-5. (Tr. at 429) Dr. Mazagri reviewed the risks and benefits of left L4-5 partial laminectomy and discectomy with Claimant, who agreed to proceed with surgery. (Id.) Dr. Mazagri also advised that the Claimant would need aggressive physical therapy after the surgery and be involved in a weight reduction program. (Id.)

On August 1, 2016, Kip Beard, M.D., performed a consultative internal medicine examination. (Tr. at 369-377) Claimant complained of bilateral shoulder, hip, knee, lower extremity, and back pain. (Tr. at 369) She stated that she could sit for 10 to 15 minutes, stand for 10 minutes, walk for 10 minutes, and lift only 15 pounds. (Tr. at 370) On physical examination, Claimant had a stable station, ambulated with an initially stooped posture slow in pace and limping on the left but without the use of aids; Dr. Beard noted Claimant did not seem to require assistive devices. (Tr. at 371) She arose from a seat and stepped up and down from the examination table with only mild difficulty. (Id.) A clinical assessment revealed general sensory abnormalities at L5. (Tr. at 373) Weakness was difficult to assess due to Claimant's discomfort, but her reflexes were normal and there was no evidence of any muscle atrophy. (Id.) A straight leg raising test was mildly positive bilaterally. (Id.) A spinal exam revealed pain and motion loss about the neck, without neurologic compromise. (Id.) An evaluation of Claimant's joints revealed some mild motion loss of the shoulders and hips. (Id.) There was no evidence of inflammatory arthritis. (Id.) A neurologic assessment related to Claimant's complaints of headaches was unremarkable. (Id.)

On September 8, 2016, Claimant underwent a left L4-L5 partial laminotomy and discectomy nerve root decompression. (Tr. at 397) On September 21, 2016, at her first postoperative examination, Claimant reported some incisional soreness but feeling much better and rated her

pain at 3/10 at its worst; she denied radiating pain down her legs, numbness and tingling and was not taking anything for her pain. (Tr. at 418) On a physical examination, she had 5/5 strength in her lower extremities, she walked with a normal tandem gait, and heel and toe walking did not elicit any back pain. (Id.) It was recommended that Claimant attend a course of physical therapy for strength training of her lumbar area. (Id.)

Claimant attended physical therapy in October and November 2016 (Tr. at 582-614), but she was discharged in late December 2016 after she failed to return for additional appointments (Tr. at 581).

On November 9, 2016, Claimant presented to the Nurse Practitioner Suzanne Spooner (for Dr. Mazagri) and complained that physical therapy made her pain worse. (Tr. at 650) It was noted that she had 5/5 strength in her lower extremities and positive straight leg raise bilaterally. (Tr. at 653) Ms. Spooner advised Claimant to stop physical therapy and to continue using conservative treatment measures such as medications and a lumbar brace. (Tr. at 654) She gave Claimant a note to remain out from work for two weeks. (Id.)

On November 23, 2016, she returned and complained that she continued to have mid back pain that radiated into her right hip and leg. (Tr. at 648) On a physical examination, her gait was generally normal, but she sometimes limped on the right leg. (Id.) Her strength was 5/5 in her lower extremities, her sensation was decreased on her right lateral thigh, and her reflexes were equal bilaterally. (Id.) Another MRI of Claimant's lumbar spine was planned; it was noted that if the MRI did not show any justification for her symptoms, pain management may be entertained. (Id.)

An MRI of Claimant's lumbar spine, on December 27, 2016, revealed post-surgical changes without significant encroachment on the spinal canal, and no well-formed fluid collections. (Tr. 573). There were no areas of high-grade neural foraminal or spinal canal encroachment and only mild degenerative changes. (Id.) There was a mildly decreased diffuse T1 marrow signal. (Id.)

Claimant had her final appoint with Dr. Mazagri on January 13, 2017; Dr. Mazagri reported that Claimant walked in the room normally, with no evidence of limping. (Tr. at 642) She was moving both of her legs well, with good muscle strength and tone, her gait was normal, and she had restricted lumbar flexion and extension. (Id.) Dr. Mazagri noted that although Claimant had improved to some extent, she continued to be bothered with pain in the lower back, more so than the legs, bilaterally, and lately more on the left side. (Id.) Dr. Mazagri advised Claimant to lose weight and referred her for pain management. (Id.)

On August 19, 2017, Claimant went to the emergency room with complaints of back pain after bending. (Tr. at 803) A physical examination revealed normal range of motion in her extremities with good muscle tone and strength. (Tr. at 804) Claimant admitted that she exercised by walking 30 minutes per day, seven days per week. (Tr. at 818) X-rays of her cervical and lumbar spine were normal. (Tr. at 819-820)

Treating Neurosurgeon Opinion Evidence:

On December 29, 2016, Dr. Mazagri completed a Medical Source Statement in which she opined that Claimant could frequently lift less than 10 pounds; stand/walk for at least two hours; and sit for less than six hours in an eight-hour workday. (Tr. at 574-575) Dr. Mazagri indicated that many of her opinions were "pending MRI results," however, she opined that Claimant was limited in her ability to push and pull with her lower extremities, and that she could never climb,

balance, kneel, crouch, crawl, or stoop, and had no manipulative or environmental limitations. (Tr. at 576-577)

Primary Care Provider Opinion Evidence:

On May 12, 2016, Dr. Cavender completed a Short-Term Disability Claim Form in which she indicated that Claimant's current restrictions were no lifting, bending, stooping, or lifting of more than 10 pounds, and no prolonged sitting, standing, or walking. (Tr. at 511) Dr. Cavender indicated that these restrictions were due to lumbosacral pain, bilateral radiculopathy, and Claimant's legs giving out. (Id.)

On June 15, 2016, Dr. Cavender opined that Claimant should not lift more than 25 pounds and should not stay in the same position for more than 30 minutes. (Tr. at 474-478) She opined that Claimant could not return to her past work as a certified nurse's assistant because the job involved lifting, bending, and stooping, and required her to drive. (Tr. at 474, 478)

On July 27, 2016, Dr. Cavender opined that Claimant had to change position every 20 minutes from standing, sitting, and lying down secondary to pain across her low back and left lower extremity. (Tr. at 446) Dr. Cavender opined that Claimant could no longer work as a nurse because it required her to drive for up to one hour and to lift, pull, and tug on patients. (Id.) She opined that Claimant could not sit, stand, or bend for more than 15 minutes. (Id.)

On March 29, 2018, Dr. Cavender completed a Medical Source Statement in which she opined that Claimant could lift and carry no more than five pounds, stand for less than two hours, and sit for less than six hours in an eight-hour workday. (Tr. at 753-754) Dr. Cavender opined that Claimant had a limited ability to push and/or pull with her upper and lower extremities due to cervical and lumbar spine arthritis and degeneration, right carpal tunnel syndrome, and

13

fibromyalgia. (Tr. at 754) She opined that Claimant could never climb, balance, kneel, crouch, crawl, or stoop. (Id.) She also opined that Claimant had a limited ability to reach, handle, finger, and feel, but she could perform these activities on a frequent basis. (Tr. at 755) She opined that Claimant had environmental limitations relating to temperature extremes, noise, vibration, humidity, hazards, and fumes. (Tr. at 756)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she stopped working in December 2010 due to back pain (Tr. at 40-42) After her alleged onset of disability, Claimant worked part-time as a home health aide from 2011 to 2016. (Tr. at 41-42) She testified that she had low back pain with numbness in both legs, and that a 2016 laminectomy did not reduce her pain. (Tr. at 42-44) She stated that she started using a cane since her back surgery and that she uses it to walk every day. (Tr. at 43) She was no longer undergoing lumbar epidural injections because they were painful and ineffective. (Tr. at 44-45) Claimant testified that her November 2017 bariatric surgery enabled her to lose 86 pounds, but her weight loss also did not reduce her back pain. (Tr. at 46-47)

Claimant testified that she also suffers from migraine headaches three to four times a week and she does not experience any resolution from them until twelve hour or more later. (Tr. at 47-48) She stated that sound and light are aggravating factors and that she will try to be as still as she can and remain in a dark room; her medication makes her sleep for hours. (Tr. at 48)

Claimant testified that she lived with her two young sons, and her mother and a friend helped her to care for her sons and did all of the laundry, housework, and cooking. (Tr. at 49)

Claimant estimated that she could walk less than 50 feet, sit for 10 minutes at a time, and had difficulty standing, stooping, and squatting. (Tr. at 50-51)

Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a hypothetical individual with Claimant's vocational characteristics who was limited to sedentary work with a sit/stand option at one hour intervals that required only occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, or crawling; required no climbing of ladders, ropes, or scaffolds; and involved no exposure to unprotected heights, and no more than occasional exposure to vibrations. (Tr. at 53) The VE testified that the hypothetical individual would be capable of performing the representative sedentary occupations of order clerk (approximately 211,000 jobs in national economy), surveillance system monitor (approximately 79,000 jobs in national economy), and assembler (approximately 170,000 jobs in national economy). (Id.)

When asked by Claimant's attorney if the individual was further restricted to no lifting more than five pounds in any capacity; standing or walking less than two hours in an eight-hour workday; limitations in pushing and pulling with both upper and lower extremities; never climbing, balancing, kneeling, crouching, crawling, or stooping; limitations in reaching in all directions; fingering and feeling limited to frequently; and limited in temperature extremes, noise, vibration, humidity, hazards and fumes, the VE responded that there would be no jobs. (Tr. at 55-56) In short, the VE testified that the limitations endorsed by Dr. Cavender on March 29, 2018 (Exhibit 15F, Tr. at 706-710) would preclude all jobs. (Tr. at 56) In response to the ALJ, the VE opined that of the limitations stated by Claimant's attorney, those pertaining to standing, walking and sitting would amount to less than an eight-hour day and therefore prevent other work. (Id.)

15

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Evaluation of Opinion Evidence:

The Regulations provide the definition for "medical opinions":

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence

we receive." Id. §§ 404.1527(b), 416.927(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." Id. §§ 404.1527(c), 416.927(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. §§ 404.1527(d)(2), 416.927(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. §§ 404.1527(d)(3), 416.927(d)(3).

With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See Id. §§ 404.1527(c)(2), 416.927(c)(2).[4] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility

---

[4] The treating source rule has since been eliminated, effective March 27, 2017, however, because this claim predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

for benefits. Id. §§ 404.1527(c)(2), 416.927(c)(2). Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id.

Prior to his evaluation of Dr. Cavendar's opinions concerning Claimant's impairments, the ALJ considered Claimant's attorney's argument that her back impairment equaled in severity Listing 1.04. (Tr. at 15) The ALJ acknowledged that Claimant had been treated for stenosis, however, "there is no evidence of an inability to ambulate effectively." (Id.) Despite Claimant's use of a cane and argument that she had deficits in ambulation, the ALJ pointed out that "practitioners often noted a normal gait and station and ambulation without the use of any assistive device (Exhibit 3F, 4F, 22F)." [5] (Tr. at 15) Additionally, the ALJ noted that Claimant's physical examinations revealed no atrophy of the musculature. (Tr. at 15, 334-354, 355-365, 366-368[6])

Next, the ALJ considered Claimant's own allegations that her disability began in December 2010 in part due to her back pain, but noted that "[t]he record contains minimal treatment however until almost a year later when she sought treatment with Charleston Area Medical Center emergency room in September 0f 2011 for back pain." (Tr. at 16, 444-571) Claimant followed up with Dr. Cavendar, who noted Claimant's spine revealed no tenderness or deformity, although she had pain into the right paralumbar musculature upon palpation and negative straight leg raise test. (Id.) The ALJ noted that an October 2011 MRI revealed degenerative changes, disc protrusions at

---

[5] The ALJ cited the office treatment records from Dr. Dave of the Neurology & Headache Clinic dated December 8, 2009 through May 16, 2016 (Tr. at 334-354); the office treatment records dated June 9, 2016 from Dr. Walker of the Brain & Spine Specialists (Tr. at 355-365); and emergency department records from CAMC dated December 27, 2017 (Tr. at 928-1011).

[6] In addition to Exhibits 3F and 4F, the ALJ cited Exhibit 5F which concerned Claimant's physical therapy records dated July 13, 2016.

L3-4 and L4-5 asymmetric to the left and areas of canal and foraminal stenosis. (Tr. at 16, 334-354)

The ALJ also considered the medical records from Dr. Darshan Dave, who observed in August 2015 and in May 2016 that Claimant had a normal gait and station and normal range of motion and no atrophy, despite Claimant's ongoing complaints of pain and numbness in her left leg when standing for a while. (Id.) The ALJ also noted that in June 2016, Claimant sought treatment with Dr. Walker, who observed an antalgic gait, normal station, pain to palpation over the midline lumbar spine, painful range of motion with flexion and extension, 5/5 strength in all extremities, but slightly weaker in her left hip and knee, normal and painless range of motion in all joints with no instability, atrophy, swelling or tenderness, and positive straight leg raise test bilaterally. (Tr. at 16, 355-365) Also, the ALJ noted that Dr. Walker determined there was no surgically remediable spinal pathology and recommended Claimant see a pain management clinic. (Tr. at 16-17, 355-365)

The ALJ considered Claimant's physical therapy records, noting that she completed two sessions in May and July 2016 and that she made good progress in range of motion and strength, however, despite recommendations to continue, she did not return to receive any further physical therapy treatment. (Tr. at 17, 366-368)

The ALJ noted that treatment records from pain management in July 2016 indicated that Claimant stood and walked unassisted, although she had slightly diminished sensation to touch on the left and 4/5 strength. (Tr. at 17, 639-705) Next, the ALJ considered Dr. Beard's mild findings during the consultative examination in August 2016, *supra*, and that Claimant exhibited a stable station and ambulation without the use of aids. (Tr. at 17, 369-377)

Next, the ALJ considered the records concerning Claimant's September 2016 left L4-5 partial laminectomy and discectomy and that she reported only mild back pain at her first post-operative treatment. (Tr. at 17, 378-416, 417-443) The ALJ noted that Claimant received physical therapy in October and November, however, she was discharged because she did not return to appointments. (Tr. at 17, 579-620) Although at follow-up appointments she complained of left leg pain and "now reported right leg numbness and pain", the ALJ noted that records indicated her lower extremities had equal sensation bilaterally, strength was 5/5, but positive straight leg raise. (Tr. at 17, 639-705) The ALJ acknowledged that Claimant reported to her providers no improvement by November, however an MRI showed post-surgical changes without significant encroachment on the spinal canal and no well-formed flued collections (Tr. at 17, 572-573), and by January 2017, Claimant was advised to lose weight and referred to a pain management clinic. (Tr. at 17, 639-705) The ALJ then noted that when Claimant presented to the emergency room in August 2017 reporting back pain from bending, a physical examination revealed normal range of motion in her extremities, she had good muscle tone and strength and that Claimant "admitted she exercised by walking 30 minutes per day, seven days per week[.]"[7] (Tr. at 17, 796-823) Lastly, the ALJ noted that CAMC emergency department records indicated Claimant's gait was normal in December 2017. (Tr. at 17, 928-1011)

The ALJ then considered Claimant's statements in her Function Report, wherein she reported she was unable to lift, bend, or stand due to her back pain, that she does not drive unless absolutely necessary, and she had problems performing personal care due to her physical

---

[7] It appears that part of the ALJ's findings from this evidence were cut off: "X-rays of her lumbar and cervical spine were (Exhibit 19F)" (Tr. at 17). Nevertheless, the record indicates that these x-rays revealed a "negative cervical spine" (Tr. at 819) and a "normal" lumbar spine (Tr. at 819-820).

constraints. (Tr. at 18, 237-244) The ALJ acknowledged Claimant's hearing testimony, specifically that she had been using a cane every day since her back surgery in 2016, that she could not lift her son since he was four months old, and she could walk less than 50 feet. (Tr. at 18)

In his comparison of the medical evidence with Claimant's statements about her lumbar issues, the ALJ observed that the record did not support her allegations of dysfunction, noting the mild imaging findings, that she exhibited normal gait and full strength in physical examinations and that she continued to work after her alleged onset date and take care of her children. (Tr. at 18, 639-705, 711-727, 753-795)[8] In addition to again observing that she admitted to exercising daily in December 2017, the ALJ recognized that Claimant "did not follow up with providers and did not complete physical therapy." (Tr. at 18) The ALJ also acknowledged that Claimant had a history of morbid obesity and that she underwent weight loss surgery in November 2017, as well as Claimant's testimony that she lost 86 pounds, but this weight loss did not help her back pain. (Id.) The ALJ noted that there "is no specific evidence of any impact the claimant's obesity has on her back impairments" but acknowledged that it "might contribute to her low back pain and lumbar issues." (Id.)

Following his review of the medical and other evidence, the ALJ then discussed the opinion evidence. First, the ALJ determined the opinions from the State agency medical consultants that Claimant was capable of light work with several environmental limitations were entitled to "limited weight as they were based on an outdated medical record and not supported by the record as a whole." (Tr. at 18, 58-67, 80-89) Next, the ALJ gave "partial weight" to the opinion of Dr.

---

[8] In addition to treatment records from Marshall Health dated July 15, 2016 through February 15, 2017, the ALJ cited the office notes and Treating Source Statement of Claimant's Ability to Do Work Related Activities dated May 6, 2016 through March 29, 2018 from Claimant's primary care physician, Dr. Cavender.

Mazagri, noting that many of the restrictions listed were "pending MRI results" and that the MRI later revealed no significant degenerative joint disease; the ALJ also explained that although Dr. Mazagri opined Claimant could never crouch, during the consultative examination, she was able to squat, also, Dr. Mazagri's own treatment notes revealed Claimant had a normal gait without limping and good strength and did not recommend further surgical intervention. (Tr. at 18-19, 574-578, 369-377, 711-727)

Finally, from all this evidence, the ALJ then considered Dr. Cavender's opinions as follows:

> Susan Cavend[e]r, M.D. provided several opinions. In one instance, she noted the claimant needed to change position every 20 minutes from standing, sitting, and lying down. She indicated the claimant could not sit, stand, or bend more than 15 minutes. Dr. Cavend[e]r also stated the claimant was unable to return to past job. I give these opinions partial weight. In June 2016, Dr. Cavend[e]r stated the claimant could not bend or stoop, lift more than 10 pounds, or perform prolonged sitting, standing, or walking. In March 2018, Dr. Cavend[e]r opined the claimant could frequently lift less than 10 pounds, stand/walk at least two hours, and sit less than six hours in a workday. Dr. Cavend[e]r reported limited pushing and pulling in her lower extremities and stated the claimant could never climb, balance, kneel, crouch, crawl, or stoop. She also found the claimant was limited in manipulative abilities and exposure to temperature, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals and gases (Exhibit 15F, 18F)[9]. Although Dr. Cavend[e]r has a long-term treatment relationship with the claimant, her opinions are both internally inconsistent and not supported by the medical record. For example, she stated the claimant needed to change positions after 20 minutes of sitting, but later stated the claimant could not sit for than 15 minutes. In her handwritten notes she provided "off work" recommendations, but it was occasionally unclear if this was based on her own assessment or the claimant's own statements (Exhibit 9F/18)[10]. For example, treatment notes reveal the claimant "states absolutely no lifting" more than 25 pounds and "does not [recommend] returning to work" (*Id.*). The record overall does not support the limitations opined by Dr. Cavend[e]r.

---

[9] These exhibits concern Dr. Cavender's March 29, 2018 medical source statement and Dr. Cavender's office treatment notes as well as her treating source statement of claimant's ability to do work related activities dated May 6, 2016 through March 29, 2018. (Tr. at 706-710 and 753-795, respectively)

[10] The ALJ refers to Dr. Cavender's handwritten notes dated June 15, 2016. (Tr. at 461)

(Tr. at 19)

Claimant has argued that the ALJ's evaluation of the opinion evidence from Dr. Cavender falls short of legal requirements because the ALJ did not abide by the factors endorsed by the Regulations when evaluating opinion evidence, but ostensibly to the extent that Dr. Cavender essentially found Claimant was capable of less than sedentary weight and thus disabled. (ECF No. 11 at 12-13) To the extent that Dr. Cavender opined that Claimant could not return to work or was to remain "off work" or even that she was incapable of performing work that was sedentary, as stated *supra*, the Regulations explicitly state that such statements do not constitute "medical opinions" but are instead opinions on issues reserved to the Commissioner, and therefore the ALJ was not obligated to analyze such opinions pursuant to Sections 404.1527(c) and 416.927(c). Indeed, the ALJ was under no duty to "give any special significance to the source of an opinion on issues reserved to the Commissioner." See 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Despite Claimant's assertion that the ALJ "cites no rational basis for disregarding treating source opinion evidence" (ECF No. 11 at 13), it is abundantly apparent that the ALJ considered numerous opinions provided by Dr. Cavender. The ALJ expressly found that Dr. Cavender's limitations were not only internally inconsistent but also not supported by the medical record. (Tr. at 19) Significantly, the ALJ cited an example of an internal inconsistency as well as an example of how Dr. Cavender's handwritten notes were unclear as to whether it was her opinion or referring to Claimant's own statements. (Id.) In short, the ALJ gave "good reasons" why he did not give Dr. Cavender's opinions controlling weight pursuant to Sections 404.1527(c)(2) and 416.927(c)(2).

As discussed above, the ALJ's thorough review of the medical evidence and other evidence of record prior to his evaluation of Dr. Cavender's opinions provided the gravamen of the

23

inconsistencies between the overall evidence and Dr. Cavender's opinions. This Court has rejected any requirement that an ALJ is obligated to discuss every piece of evidence of record, but only to consider all of the evidence. Goad v. Astrue, No. 06-00870, 2008 WL 644881, at *1 (S.D.W.Va. Mar. 7, 2008); Nisbet v. Colvin, No. 13-33047, 2015 WL 893010, at *17 (S.D.W.Va. Mar. 2, 2015); Bays v. Colvin, No. 14-1564, 2005 WL 769784, at *21 (S.D.W.Va. Feb. 23, 2015). Moreover, as stated by the Commissioner, the ALJ is not required to recount the details of his analysis of medical opinions. Tucker v. Astrue, 897 F.Supp.2d 448, 468 (S.D.W.Va. Sept. 27, 2012) (Eifert, M.J.) (ECF No. 12 at 15) There is no indication of Dr. Cavender's specialty that necessitated any enhanced treatment for her opinions as provided under the Regulations' enumerated factors. See 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist"). The fact that the ALJ acknowledged that Dr. Cavender had a long-term treating relationship with Claimant indicates that the ALJ had an appreciation for her opinion, as her treatment notes would have provided "a detailed, longitudinal picture" of Claimant's alleged disability, however, as the ALJ observed, the medical record, including Dr. Cavender's own treatment notes, simply did not "support" her extreme conclusions, and further, showed that her opinions were not "consistent". See 20 C.F.R. §§ 404.1527(c)(2)-(4), 416.927(c)(2)-(4).

Accordingly, the undersigned **FINDS** that the ALJ discharged his duty pursuant to the pertinent factors espoused by the Regulations when evaluating Dr. Cavender's opinions.

To the extent that Claimant contends that the ALJ's resultant RFC assessment is not supported by substantial evidence because it did not adopt Dr. Cavender's limitations, thus

rendering a finding that Claimant was disabled (ECF No. 11 at 13)[11], this argument lacks merit. As discussed *supra*, the ALJ provided an adequate explanation for the limitations related to Claimant's lumbar issues and other impairments and fairly accommodated them in the resultant RFC, limiting her to sedentary work. To that extent, the undersigned **FINDS** that the ALJ provided "good reasons" for not giving Dr. Cavender's collective opinions controlling weight. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). The record of evidence on the whole does not suggest that the ALJ merely selected trivial or insignificant inconsistencies "[b]y relying on these limited observations to discredit the treating source opinions . . . while overlooking the record's broader import . . . ."[12] In addition to Dr. Cavender's own treatment notes, the ALJ considered the other medical opinions, as well as the other evidence of record, thus providing the necessary narrative in his ultimate determination that Dr. Cavender's opinions concerning Claimant's limitations were only entitled to partial weight, and not controlling weight.

Accordingly, the undersigned **FINDS** the ALJ's RFC assessment is supported by substantial evidence.

---

[11] The undersigned notes that Claimant mentions briefly in his concluding argument that the ALJ's decision should be reversed because "the ALJ does not address uncontested vocational testimony which establishes [Claimant] cannot perform/maintain employment when one considers Dr. Cavender's opinions" (ECF No. 11 at 13); Claimant merely concludes that "a finding of disability is mandated by applicable regulations and law." (Id.) Claimant ostensibly advocates the proposition that this Court reweigh the conflicting evidence of record and substitute its own opinion in lieu of the ALJ's, which has long been deemed improper. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determination, or substitute our judgment for that of the [ALJ]." Regardless, given the lack of any additional argument supporting this position, Claimant has waived any argument on this specific issue. Grayson O Company v. Agadir International LLC, 856 F.3d 307, 316 (4th Cir. 2017).

[12] Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018); Testamark v. Berryhill, 736 F. App'x 395, 398-399 (4th Cir. 2018).

Finally, the undersigned **FINDS** that the Commissioner's final decision that Claimant was not under a disability since December 11, 2010 through the date of the ALJ's decision is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 11), **GRANT** the Commissioner's request to affirm the decision below (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933

(1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Goodwin, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 3, 2020.

Omar J. Aboulhosn
United States Magistrate Judge